***UNSEALED***

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF FLORIDA ex rel. CARRIE L. MORRIS, M.D., | |
| **Plaintiff,** | CASE NO.: _____ |
| v. | **FILED UNDER SEAL** |
| BREVARD EYE CENTER, INC.; BREVARD SURGERY CENTER, INC.; PAUL J. BEFANIS, M.D.; RAPHAEL TRESPALACIOS, M.D.; GARY HARDEY; DAVID STRUNK, O.D.; SHEA ERHET, O.D.; DAVID HENDRIX, O.D.; PAULA MINTCHELL, O.D.; MARK FISHER, O.D.; and BRETT REYNOLDS, O.D., | 6:14-cv-1460-ORL-37KRS |
| **Defendants.** | |

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Relator Carrie L. Morris, M.D. ("Relator") by and through her counsel, hereby files this Complaint and Demand for Jury Trial against Defendants and alleges as follows:

### NATURE OF ACTION

1.      Relator brings this action on behalf of the United States of America against Defendants for their violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and on behalf of the State of Florida against Defendants for their violations of the Florida False Claims Act ("Florida FCA"), Fla. Stat. § 68.081, *et seq.*

2.      Relator also brings this action to address Defendants' retaliation against Relator in violation of the whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h).

S1

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the claims arising under the federal FCA pursuant to 31 U.S.C. §§ 3732(a) and 3730(b), and 28 U.S.C. §§ 1345 and 1331. This Court has jurisdiction over the claims arising under the Florida FCA pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

3.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729, *et seq*. and Fla. Stat. § 68.081, *et seq*., and complained of herein, took place in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because at all times material hereto, Defendant Brevard Eye Center, Inc. transacts and transacted business in this District.

## PARTIES

4.     Relator Carrie L. Morris, M.D. is a citizen of the United States and a resident of the State of North Carolina. Relator is board certified ophthalmologist, specializing in oculoplastic surgery. She was employed as such by Defendant Paul J. Befanis, M.D., P.A., d/b/a Brevard Eye Center ("BEC") from November 1, 2010 until January 4, 2012.

5.     Relator is an original source of this information to the United States and the State of Florida. Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States and the State of Florida before filing this action under the FCA and Florida FCA.

4.     Defendant Brevard Eye Center, Inc. ("BEC") is a Florida Corporation, f/k/a Paul J. Befanis, M.D., P.A. until December 30, 2013. BEC is a medical eye care facility with seven locations in Brevard County, Florida. Its primary business address is 665 Apollo Boulevard, Melbourne, Florida 32901.

5.      Defendant Brevard Surgery Center, Inc. ("the Surgery Center") is an Ambulatory Surgery Center affiliated with Defendant BEC, located in the same facility as BEC's primary office, 665 Apollo Boulevard, Melbourne, Florida 32901.

6.      Defendant Paul J. Befanis, M.D., was the President and owner of Paul J. Befanis, M.D., P.A. and the Surgery Center. Upon information and belief, Defendant Befanis is currently a partial owner of the Surgery Center and BEC. Defendant Befanis is also an ophthalmologist employed by BEC.

7.      Defendant Gary Hardey was the Chief Executive Officer of Paul J. Befanis, M.D., P.A. and is currently the Vice President, Treasurer, and Chief Executive Officer of both BEC and the Surgery Center.

8.      Defendant Raphael Trespalacios, M.D. is the current President and partial owner of BEC and the Surgery Center.

9.      Defendant David Strunk, O.D. is an optometrist who retired from BEC in or around March 2011.

10.     Defendant David Hendrix, O.D. is an optometrist currently employed by BEC.

11.     Defendant Shea Ehret, O.D. is an optometrist currently employed by BEC.

12.     Defendant Paula Mintchell, O.D. is an optometrist employed by BEC until about 2013.

13.     Defendant Brett Reynolds, O.D. is an optometrist currently employed by BEC.

14.     Defendant Mark Fisher, O.D. is an optometrist currently employed by BEC.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

15.     As required by the federal FCA, 31 U.S.C. § 3730(b)(2), and the Florida FCA, Fla. Stat. § 68.83(3), Relator has provided to the Attorney General of the United States, the

United States Attorney for the Middle District of Florida, the Attorney General of the State of Florida, and the Chief Financial Officer of the State of Florida a statement of all material evidence and information related to the Complaint. The disclosure statement is supported by material evidence known to Relator at the time of filing, establishing the existence of Defendants' false claims. The disclosure statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the U.S. Attorney General, the United States Attorney, the Florida Attorney General, and the Florida CFO in their capacities as potential co-counsel in this litigation; therefore, the disclosure is confidential.

## GOVERNMENT HEALTHCARE PROGRAMS

16.    The Health Insurance for the Aged and Disabled Act (title XVIII of the Social Security Act), known as "Medicare," includes two related health insurance programs—hospital insurance (Part A) and supplementary medical insurance (Part B). Medicare also includes the Medicare Advantage program (Part C), formerly known as "Medicare+Choice." Under Part C, CMS contracts with public or private organizations to offer a variety of health plan options for beneficiaries. Qualified individuals may then "opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services. At issue in this case are federal funds provided under Parts B and C.

17.    Additionally, federal funds provided under the TRICARE program are at issue in this case. The United States Government provides a comprehensive health care system under which eligible individuals may receive medical treatment from both Military Treatment Facilities and from civilian facilities. The TRICARE program is a "managed health care program for the delivery and financing of health care services in the Military Health System." 32 C.F.R. §

199.17(a). Originally, civilian-facility care was provided pursuant to the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), *see* 32 C.F.R. § 199.1(a). The CHAMPUS regulations still apply to the TRICARE program except where preempted by TRICARE regulations. 32 C.F.R. § 199.4(a)(ii).

18.     Funds provided through the Florida Medicaid program are also at issue in this case. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. The Centers for Medicare and Medicaid Services ("CMS") administer Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures. In Florida, the Agency for Health Care Administration ("AHCA") is responsible for the administration of Florida's Medicaid program as set forth in Chapter 409, Florida Statutes.

19.     Finally, funds provided pursuant to the Federal Employees Health Benefits ("FEHB") program are at issue. 5 U.S.C. § 8901 *et seq.* sets forth the FEHB program, pursuant to which the federal government provides health insurance to its employees, retirees, and their survivors. The FEHB program is administered by the Office of Personnel Management, and is funded, in part, by the federal government via the Federal Employee Benefits Fund. 5 U.S.C. § 8909. The primary FEHB insurance plan utilized by Defendants' patients is Blue Cross and Blue Shield Federal ("BCBS Federal").

20.     Medicare Part B, Medicare Part C, TRICARE/CHAMPUS, Florida Medicaid, and FEHB shall hereinafter be collectively referred to as "Government Health Programs" or "GHPs".

## GENERAL ALLEGATIONS

21.     The Surgery Center and BEC's seven eye-care facilities are located in Brevard County, Florida, which is situated along the Atlantic coast of Florida and is home to a large population of retirees, the majority of whom are Medicare beneficiaries. As a result, approximately seventy-five percent of Defendants' patients are Medicare beneficiaries.

22.     The Kennedy Space Center and the Patrick Air Force Base are also located in Brevard County, resulting in a significant number of patients utilizing the FEHB program and TRICARE. Indeed, one of BEC's offices is located on the Patrick Air Force Base.

23.     Additionally, Defendants provide services to a considerable Medicaid population at BEC's Palm Bay office.

24.     BEC's CEO, Defendant Gary Hardey, orchestrated multiple schemes to defraud the government without being detected, and the managing partners, Defendants Befanis and Trespalacios, were complicit in his schemes. Furthermore, Defendants were aware of the fraudulent nature of their actions because they took steps to conceal the fraud, including shredding documents.

*Fraudulent Anesthesia Billing*

25.     Oculoplastics is a sub-specialty of ophthalmology, focusing on plastic and reconstructive surgery of the periorbital and facial tissues including the eyelids, eyebrows, forehead, cheeks, orbit (bony cavity around the eye), and lacrimal (tear) system.

26.     Relator was hired by BEC to conduct oculoplastic surgery and the related patient care. Relator's practice includes both medically necessary and cosmetic surgeries.

27.     Under federal statutes, federal regulations, and program-specific rules and regulations, GHPs will reimburse providers for medically necessary procedures, including

anesthesia products and services used in commission of these medically necessary procedures, but they will not reimburse for cosmetic procedures. *See, e.g.,* 42 U.S.C. § 1395y(a)(10); 42 C.F.R. § 411.15(h); 32 C.F.R. § 199.4(e)(8); 5 U.S.C. § 8902(n).

28.    Providers cannot circumvent these prohibitions by grouping procedures together into the same operative session. 32 C.F.R § 199.4(c)(3)(i). Medicare regulations require that providers notate the time that physicians start and stop cosmetic procedures and then subtract that time from the total anesthesia time it bills to the GHP.

29.    Cosmetic procedures are very lucrative. Therefore, BEC continuously makes efforts to grow the cosmetic portion of its oculoplastic practice. These efforts include offering patients "package deals," whereby patients receive a discount on any cosmetic surgery that they undergo during the same operative session as a medically necessary one.

30.    These "discounts" are equal to the amount the patient would be charged for the anesthesia associated with the cosmetic procedure if they were to have only the cosmetic procedure.

31.    BEC, by and through the Surgery Center, then recoups the money by submitting a claim to the GHP that requests reimbursement for the entire amount of the anesthesia fees for the entire operative session, including the cosmetic portion, rather than for only the medically necessary portion to which it is lawfully entitled.

32.    By submission of claims for the entire amount of the anesthesia services, the Surgery Center/BEC falsely misrepresents to the GHP that the anesthesia services were provided solely for medically necessary procedures and are thus properly reimbursable.

33.    The anesthesia services at the Surgery Center are provided by a CRNA who is employed on a locum tenens basis and is paid an hourly wage, rather than per service provided.

7

Accordingly, BEC and the Surgery Center are responsible for billing GHPs for the anesthesia services, not the CRNA.

34.     Additionally, upon information and belief, the anesthesia time records are falsified to reflect that the entire operative session was for a medically necessary purpose.

35.     Anesthesia services are charged to GHPs based on the time that those services are rendered, which is billed in fifteen minute increments called "units."

36.     When Relator performed these package deal surgeries, neither the CRNA nor the Surgery Center/BEC asked Relator to specify when she completed the medically necessary surgery and began to perform the cosmetic surgery.

37.     Without knowing when Relator, or another surgeon, stopped working on the medically necessary procedure and began working on the cosmetic procedure, it is impossible for BEC/the Surgery Center to accurately charge GHPs for the anesthesia time associated with only the medically necessary procedures.

38.     In or about late November 2011, Relator questioned Defendant Hardey about how BEC was charging her patients. Defendant Hardey admitted to Relator that the Surgery Center/BEC was not charging the patients for facility fees or anesthesia fees associated with cosmetic procedures, and that instead the Surgery Center/BEC was charging the patients' insurance, including GHPs, for those anesthesia fees.

39.     For example, on February 25, 2011, Beneficiary S.O., a Medicare Part B and TRICARE beneficiary, underwent surgery for medically-necessary bilateral ptosis repair and direct brow lift. In the same operative session, Beneficiary S.O. underwent a cosmetic bilateral upper lid blepharoplasty.

40.     As with every surgery that Relator performed at the Surgery Center, Relator was not asked to specify when she was performing the medically necessary ptosis repair and brow lift and when she switched to the cosmetic blepharoplasty.

41.     Therefore, the Surgery Center/BEC could not accurately bill Medicare and TRICARE for the anesthesia services associated with only the medically necessary procedures. Upon information and belief, the Surgery Center/BEC fraudulently billed Medicare and TRICARE for the entire anesthesia time.

42.     Relator has attached hereto Exhibit A, which is incorporated herein, a chart containing additional examples of Relator's patients who underwent cosmetic procedures for which GHPs were billed for non-covered anesthesia time. Exhibit A includes a listing of the procedure, the date and time the procedure was performed, the patient's initials, the patient's primary and secondary insurance, and the out-of-pocket amount paid by the patient.

43.     The result of this fraudulent billing practice is that the Surgery Center\BEC routinely charges GHPs for forty-five minutes to two hours of non-covered anesthesia time per "package deal" procedure.

*Kickback Scheme*

44.     BEC pays optometrists $100.00 for every patient that they refer to BEC's ophthalmologists for the evaluation and treatment of cataracts.

45.     This arrangement constitutes an illegal kickback scheme under the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and a violation of the federal Stark law, 42 U.S.C. § 1395nn. Accordingly, claims to Medicare, TRICARE, or Medicaid for the cataract consultations and treatments resulting from the kickbacks violate the FCA and the Florida FCA.

46.     The AKS makes it a criminal offense to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly in return for or to induce referrals of items or services paid for by a "Federal health care program," including Medicare, TRICARE, or Medicaid. *Id.* §§ 1320a-7b(b), 1320a-7b(f).

47.     The Stark Laws are made up of three separate provisions which govern physician self-referral for Medicare and Medicaid patients. Under the Stark Laws, physicians are prohibited from referring a patient to a medical facility in which they have a financial interest. Given the physician's position to benefit from the referral, there is both an inherent conflict of interest and potential for over-utilization of services. In addition, such referrals could limit competition. Stark regulations may be found at 42 C.F.R. § 411.350 through § 411.389.

48.     The Designated Health Services ("DHS") covered by the Stark Laws include clinical laboratory services; physical therapy; occupational therapy; radiology and imaging services; radiation therapy and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices; home health care and supplies; outpatient prescription drugs; and inpatient and outpatient hospital care.

49.     Stark broadly defines "referral" to include a request by a physician for an item or service payable under Medicare or Medicaid (including the request by a physician for consultation with another physician, as well as any test/procedure ordered/performed by such other physician), or a request by a physician for the establishment of a care plan to include provision of a DHS.

50.     Continued compliance with the AKS and Stark are prerequisites to receiving payment under the applicable Federal health care programs.

51.     Defendant Hardey talked openly to Relator and BEC staff about the kickback scheme.

52.     For example, on or about Friday, July 15, 2011, Defendant Hardey was at the Surgery Center speaking with Relator about the volume of cosmetic surgeries. Relator mentioned that she had not been receiving as many referrals from BEC optometrist Shea Ehret. Defendant Hardey responded that if things did not pick up, he "may start giving them [optometrists] $100 for a blepharoplasty referral like I give them for a cataract referral."

53.     On other occasions, Defendant Hardey made comments about going to have lunch with non-BEC optometrists in order to "get more cataracts."

54.     As a result of BEC's illegal kickback scheme, a significantly higher percentage of BEC's patients undergo cataract surgery than do patients at similar practices.

55.     In most practices, an average of sixty to seventy percent of patients undergo cataract surgery. At BEC, eighty to ninety percent of the patients undergo cataract surgery.

56.     Most of the cataract surgeries at BEC are performed by Defendants Befanis and Trespalacios.

57.     Despite the fact that Defendant Befanis is a retinal specialist, he spends the majority of his time conducting cataract surgeries. During Relator's employment, Defendant Befanis was in surgery two days per week and performed approximately twenty-five surgeries per day, approximately twenty of which were cataract surgeries.

58.     Additionally, upon information and belief, optometrists (both BEC employees and non-BEC optomestrists) are paid monetary incentives by BEC for referrals for oculoplastic examinations.

59.     One BEC optometrist in particular, Dr. Camilla Quirie, frequently referred patients to Relator, including a large number of patients enrolled in CarePlus, a Medicare Advantage HMO plan. When the patients arrived for their appointments, they often did not know why they had been referred, they were not having vision problems, they were not interested in having surgery, and ultimately Relator found nothing medically wrong with them. Nevertheless, BEC billed for those consultations.

60.     The purpose of these referrals and unnecessary examinations was to get these patients on BEC's patient roster. Because Medicare Advantage HMO plans such as CarePlus are capitated, BEC receives a flat fee for the patient, regardless of the number of procedures performed rather than being paid on a fee-for-service basis.

61.     When Relator mentioned this to Defendant Hardey, he was not troubled by the large amount of unnecessary referrals. However, Defendant Hardey instructed Relator that she could operate on only one CarePlus patient per month since they were not getting paid on a fee-for-service basis.

*Overutilization of YAG Procedure*

62.     An issue relating to BEC's large number of cataract surgeries involves the overutilization of the YAG laser posterior capsulotomy procedure ("YAG procedure").

63.     During cataract surgery, the patient's natural lens is removed and replaced with an artificial one. The artificial lens is implanted into the membrane that had surrounded the natural lens, called the lens capsule. As a result of the cataract surgery, the lens capsule can develop scar tissue and become cloudy, resulting in vision problems similar to those caused by cataracts. The YAG procedure is used to rectify this problem.

64. Generally, only about twenty-five percent of patients who have undergone cataract surgery need a follow up YAG procedure.

65. For those patients who do need a YAG procedure, it does not normally become apparent until at least 1-3 years after the original cataract surgery.

66. BEC routinely schedules all, or nearly all, of its cataract patients for the YAG procedure, many within three months of the cataract surgery.

67. This is well in excess of the standard of care.

68. Upon information and belief, Defendants falsified patient records to indicate that the YAG procedure was necessary when it was not.

69. As part of Relator's standard evaluation of her patients, she would review the patient's prior surgical history. Nearly every patient that had undergone a cataract surgery had also undergone a YAG procedure.

70. One such patient met with Relator for a ptosis repair consultation. The patient had recently undergone a cataract surgery. While attempting to schedule a date for the ptosis surgery, the patient indicated that he was scheduled for a YAG procedure. The procedure was three months after his cataract surgery.

71. When Relator inquired about the timing of the YAG procedure, the patient replied "Dr. Tres[palacios] says they always schedule the YAG three months after the cataract surgery."

72. Not only did this excessive use of the YAG procedure result in fraudulent charges to GHPs because they were medically unreasonable, but it also resulted in greater risks to BEC's patients, including retinal detachment, macular edema, and total vision loss.

*Optometrists Practicing Outside of their Scope*

73.   BEC is knowingly permitting its optometrists (whom BEC doctors have themselves described as "money hungry") to diagnose conditions and perform procedures for which they are not trained, leading to the suffering, and in at least one case, permanent blindness, of their patients.

74.   Ophthalmologists are fully trained medical doctors who specialize in eye and vision care. In addition to their undergraduate studies, ophthalmologists have completed four years of medical school, a one year internship, and at least three years of residency. Ophthalmologists often also complete an additional one to two years of training in a subspecialty, such as oculoplastics or glaucoma.

75.   Optometrists, on the other hand, are not medical doctors. They complete undergraduate studies and a four year doctoral-level graduate program and may, but are not required to, complete a one year residency.

76.   Due to the vast difference in training, there are strict regulations on the scope of optometrists' practice.

77.   "An optometrist shall not use or perform any technique, function, or mode of treatment which the optometrist is not professionally competent to perform." Fla. Admin. Code 64B13-3.010(2). Specifically, optometrists are prohibited from performing surgery of any kind, which includes probing inflamed tear ducts. Fla. Stat. § 463.014(4). Optometrists are also prohibited from "[p]rescribing, ordering, dispensing, administering, supplying, selling, or giving any drug for the purpose of treating a systemic disease." Fla. Stat. § 463.014(3).

78.     BEC paid lip-service to these regulations by circulating an email reminding optometrists of the limitations of their licenses. However, as set forth in the specific examples below, BEC did nothing to enforce those regulations.

79.     BEC's failure to enforce these regulations resulted in many of the optometrists at BEC – including Dr. David Hendrix, Dr. David Strunk, Dr. Shea Ehret, Dr. Paula Mintchell, Dr. Mark Fisher, and Dr. Brett Reynolds – performing procedures outside the scope of their license, in violation of Florida law, and charging GHPs for those procedures.

80.     For example, many of the optometrists illegally prescribed medications, including oral antibiotics and steroid creams. Prescribing medications without adequate medical training can lead to serious complications and injuries to the patients.

81.     Dr. Ehret asked Relator for the name, spelling, and percentage of a steroid cream (Diprolene) after she learned that Relator had prescribed it to treat simple dermatitis.

82.     Dr. Ehret was very clear that she was asking Relator those details so she could prescribe it directly to her patients in the future, circumventing a medical diagnosis, which could have serious complications for the patients.

83.     Dr. Ehret specifically referenced prescribing Diprolene to Beneficiary C.B., a Medicare beneficiary.

84.     Relator was also concerned that Dr. Ehret would prescribe the steroid to Beneficiary M.P., a Medicare and Medicaid recipient; Beneficiary E.W., a Wellcare Medicare beneficiary; Beneficiary M.W., a Medicare recipient; and Beneficiary B.P., who, upon information and belief, was a FEHB beneficiary.

85.     Relator was concerned about these patients because they were also patients with simple dermatitis that Dr. Ehret referred to Relator for consultation.

86.     Further patient examples show that optometrist's illegal medical treatments lead to the payment of non-medically necessary (wrong) treatment, continued suffering, and, in some cases, permanent damage.

*Patient P.C.*

87.     On August 4, 2010, Defendant Strunk saw Patient P.C., a seventy-two year old Hispanic man who was both a Medicare and TRICARE beneficiary.

88.     Defendant Strunk treated Patient P.C. for a "lacrimal stenosis OD [right eye]" by performing a "lacrimal irrigation and probe" on the patient, which is documented in Defendant Strunk's handwriting in the patient's chart.

89.     In other words, Defendant Strunk performed a probe of Patient P.C.'s inflamed tear duct, which is expressly prohibited by Florida law. Fla. Stat. § 463.014(4).

90.     Defendant Strunk also had Beneficiary P.C. sign a "Consent to Operate" form, despite the fact that Defendant Strunk cannot legally perform any operations.

91.     Furthermore, the surgery performed by Defendant Strunk was the incorrect, and therefore medically unnecessary, treatment.

92.     An improper lacrimal irrigation and probe can cause patients to suffer unnecessary pain and often leads to permanent damage to the canaliculus. If this occurs, the patient must undergo extensive surgery in an attempt to reconstruct the nasolacrimal duct system so that tears will drain properly from the eye, including the insertion of a permanent Pyrex glass tube in their eye to circumvent the nonfunctioning tear duct system.

93.     As a result of this non-medically necessary, incorrect, and illegal treatment by Defendant Strunk, Patient P.C. continued to suffer for an additional four months before he was finally referred to Relator for the correct treatment.

94.     Relator diagnosed the patient with a "nasolacrimal duct obstruction" and performed a dacryocystorhinostomy, the proper procedure, which was successful.

95.     Upon information and belief, BEC submitted a claim to Medicare and TRICARE for Patient P.C.'s medically unnecessary tear duct probe.

96.     Relator contacted Defendant Hardey by phone immediately after her consultation with Patient P.C.

97.     Relator warned Defendant Hardey that not only were Defendant Strunk's actions illegal, but that they could have caused irreparable harm and permanent damage.

98.     In response, Defendant Hardey stated that he was going to "talk to" Defendant Strunk. When Relator asked Defendant Hardey if he was going to report Defendant Strunk's actions to any of the necessary boards and agencies, Defendant Hardey responded that he was not going to report Defendant Strunk because BEC would be responsible and he did not want BEC to get in trouble.

99.     Upon information and belief, Defendant Hardey never spoke to Defendant Strunk about the incident.

*Patient C.P.*

100.    Patient C.P., a forty-six year old man who, upon information and belief, is a BCBS Federal beneficiary, had been improperly treated over the course of six years by BEC optometrists for a painful leision on his left eyelid.

101.    On April 4, 2005, Patient C.P. first sought treatment from Defendant Mintchell, who diagnosed the patient with a "hordoleolum" also known as a stye, which is an acute, infected, and painful lesion at the rim of the eyelid.

102.    Instead of referring Patient C.P. to an ophthalmologist for proper treatment, Defendant Mintchell "expressed" the lesion with "cotton tip applicators."

103.    On March 1, 2011, Patient C.P., was treated by Defendant Hendrix for the same "bump" on his left eyelid.

104.    Defendant Hendrix's notes state that he "expressed" the patient's stye with a "CTA" (cotton tip applicator) and gave the patient "Augmentin" (oral antibiotic) for ten days.

105.    Both the drainage of the lesion and the prescription of oral antibiotics are outside the scope of an optometrist's license and were the incorrect treatment.

106.    When Patient C.P. was finally referred to Relator three months later on July 19, 2011, he told Relator that "Dr. Hendrix pushed really hard on my lid to get the stuff out in order to drain it. He drained the pus from my lid."

107.    Relator properly diagnosed Patient C.P. with a chalazion and performed the correct treatment, an incision and drainage of the chalazion.

108.    Upon information and belief, BEC submitted a claim to BCBS Federal for Patient C.P.'s medically unnecessary treatments by Defendants Mintchell and Hendrix.

109.    Relator again notified Defendant Hardey that optometrists were continuing to perform illegal and non-medically necessary procedures which were causing harm to BEC's patients. Defendant Hardey again claimed that he would put a stop to the behavior but failed to take any action.

*Patient M.R.*

110.    Patient M.R., a seventy-eight year old woman, who was a Medicare and TRICARE beneficiary, was seen by Dr. Mintchell on September 26, 2011.

111.   At this time, Dr. Mintchell instructed Patient M.R.'s primary care physician, Dr. Ziadie, to prescribe oral antibiotics, which Dr. Ziadie did without examining Patient M.R.

112.   Dr. Mintchell did not refer Patient M.R. to an ophthalmologist for proper diagnosis and care.

113.   Subsequently, on October 6, 2011, Patient M.R. presented to Defendant Hendrix with a very sore left lower eyelid with an enlarged area of induration. Defendant Hendrix diagnosed the patient with either a "lacrimal sac infection" or "dacrocystitis," and drained the inflamed eyelid.

114.   When her eyelid did not improve, Patient M.R. was finally referred to Relator on October 12, 2011. When she arrived, Patient M.R. had a dark circle, bruising, and some redness and swelling underneath her left lower eyelid.

115.   Patient M.R. told Relator that "Dr. Hendrix said that I had a lacrimal sac infection [or] dacrocystitis[,] and he drained and pushed on my eyelid and a lot of pus came out. He took approximately [five to ten] minutes for this procedure."

116.   Patient M.R. also told Relator that the procedure was very painful and she asked Defendant Hendrix to stop, but he did not.

117.   As a result of Defendant Hendrix's actions, Patient M.R.'s tear duct system underwent additional inflammation and scarring, which could have caused infection to spread into her eye and eye socket. The patient required additional surgeries to repair the damage Defendant Hendrix had caused.

118.   Relator emailed Defendant Hardey after her consultation with Beneficiary M.R., reminding Defendant Hardey that the optometrists' actions were illegal and dangerous for the patients.

119.    Upon information and belief, BEC submitted claims to Medicare and TRICARE for Patient M.R.'s medically unnecessary treatments by Defendants Mintchell and Hendrix.

*Patient D.G.*

120.    On December 15, 2011, Relator had a consultation with Patient D.G., a BCBS Federal beneficiary, who had been referred by Dr. Hendrix to evaluate tearing.

121.    During the course of the consultation, Beneficiary D.G. reported that she also had a problem with styes in the past. She informed Relator that Defendant Hendrix had drained her eyelids on several occasions by squeezing out the discharge.

122.    Given Defendant Hendrix's past actions, Relator suspects he may have performed a lacrimal irrigation and probe on Beneficiary D.G. as well.

*Patient Referred for Glaucoma*

123.    In addition to addressing the problem of optometrists performing illegal and medically unnecessary procedures with Defendant Hardey, Relator also discussed it with Defendant Trespalacios.

124.    Defendant Trespalacios informed Relator that he had similar experiences with Defendant Hendrix, whom he described as very "money hungry."

125.    For example, Defendant Hendrix referred to Defendant Trespalacios a patient in or around October 2011 who had abnormally high eye pressure due to uveitic glaucoma.

126.    Normal pressure is approximately 15mmHg (millimeters of mercury). This particular patient saw Defendant Hendrix several times with increasingly high eye pressure, reaching 40mmHg, a medical and surgical emergency. However, Defendant Hendrix continued to treat the patient for a month rather than refer him to an ophthalmologist because Defendant Hendrix was getting compensated for these visits.

127. By the time the patient was finally referred to Defendant Trespalacios, the patient was rendered permanently blind due to Defendant Hendrix's delay in referral.

128. When Defendant Trespalacios approached Defendant Hendrix on October 28, 2011 about the matter and informed Defendant Hendrix that he needed to refer patients earlier, Defendant Hendrix had no remorse.

129. Defendant Befanis told Defendant Trespalacios and Relator about this incident. At that time, Defendant Befanis commented on the fact that Defendant Hendrix made an abnormally large amount of money compared to most optometrists.

130. Based on Relator's experience with the Defendant Optometrists, Exhibit B contains additional examples of patients who, upon information and belief, received illegal and medically unnecessary treatment from BEC optometrists, for which BEC billed GHPs.

*Billing for Illegal Botulinum Toxin Injections*

131. Botulinum toxin injections are billed to GHPs under a CPT code based on the condition for which they are prescribed, but with different HCPCS codes for reimbursement of the particular product administered. Botox is billed under HCPCS code J0585. Dysport is billed under HCPCS code J0568. Myoblock is billed under HCPCS code J3490.

132. Only FDA-approved substances may legally be provided to patients. There are no generic versions of Botox, Dysport, or Myoblock that have been approved by the FDA for sale or use in the United States. Therefore, no generic versions may be injected into patients, nor have any been approved for reimbursement by any GHP.

133. Upon information and belief, BEC was purchasing what is commonly referred to as "re-imported" Botox. A re-imported drug is one initially shipped out of the United States for some reason, such as past expiration date, for use overseas. In certain instances, such as herein,

these drugs are subsequently "re-imported" to the United States from a black market source. The benefit to the re-importation recipient is the ability to obtain the product for a fraction of the price of its FDA-approved, domestically-sold counterpart.

134.    Re-imported drugs such as those complained of herein are not subject to FDA controls, regulations, and protections. The FDA has clearly stated that re-imported drugs do not go through the same oversight and packaging requirements as drugs produced for United States consumption. As such, it is not possible to know what is actually being purchased, be it actual "re-imported Botox," adulterated Botox, some other substance entirely, or even a placebo. These products are subject to tampering, dilution, modification, spoliation, and other changes, which can make them harmful to patients. Accordingly, there are strict laws and regulations regarding imported drugs.

135.    The Federal Prescription Drug Marketing Act allows only the manufacturer to import or reimport prescription drugs into the United States, or if the prescription drug is required for emergency care (which Botox is not).

136.    Importation of drugs with labeling from the country of origin or replacing the non-United States labeling with a photocopy of the FDA approved package insert are unlawful under the Federal Food, Drug, and Cosmetic Act. *See e.g.*, 21 C.F.R. § 801.15(c)(1) (requiring labeling to be in English); 21 C.F.R. 801.109(b) (labels lack federal caution statement for prescription devices); 21 C.F.R. § 801.109(d) (labeling lacks required product description, indications for use, contraindications, warning, precautions, and patient disclosure information).

137.    Because the party selling the prescription drugs and medical devices is not registered or licensed by the state to distribute drugs or medical devices, the sale and purchase is not legal.

138. From approximately 1995 to November 2010, BEC illegally purchased a non-FDA approved, Botox- like substance from distributors outside of the United States and provided it to patients under the guise that it was Botox. The purchase price for this substance was significantly lower than would be available from Allergan, the official manufacturer and sole legitimate supplier of Botox.

139. From approximately 1995 to November 2010, BEC has unlawfully submitted false claims to GHPs for the use of the re-imported Botox-like substance by using the CPT codes for approved Botulinum toxin injections, such as J-code J0585, a code that is uniquely reserved for FDA-approved, brand name Botox.

140. From approximately 1995 to November 2010, BEC similarly unlawfully submitted false claims to GHPs for the use of other re-imported botulinum toxin injections using their respective HCPCS codes that are uniquely reserved for FDA-approved, brand name botulinum toxin injections purchased from their respective manufacturers.

141. The significance of this is twofold: a fraud is being perpetrated on the federal Government and the State of Florida, as they are being billed for and paying for a product not properly reimbursable, and, more importantly, the patients face potential grievous physical harm as they are being exposed to non-regulated toxic substances.

142. Part of Relator's position at BEC involved growing its cosmetic practice. In furtherance of that objective, Relator examined BEC's botulinum toxin injection records and supplies at the beginning of her employment.

143. Relator noticed that BEC had "non-branded botox" in stock.

144. In addition, BEC's records reflected that Defendant Trespalacios had been using non-branded or re-imported botulinum toxin on blepharospasm and hemifacial spasm patients for

the previous four years, and the preceding oculoplastic surgeons had been using it for the previous fifteen years.

145. Relator questioned Defendant Hardey about this and explained that she would only use brand-name Botox that was manufactured by Allergan. Relator asked Defendant Hardey if BEC had a relationship with an Allergan sales representative.

146. Ultimately, Defendant Hardey admitted that BEC did not have a relationship with Allergan or any of the brand-name producers, and that it purchased non-branded botox from a non-American group purchasing organization.

147. Upon Relator's insistence, BEC thereafter established an account with Allergan to order brand-name Botox for Relator's use.

148. Relator inherited many patients when she joined BEC whose records reflected that they received non-branded botulinum toxin injections. Those patients include, but are not limited to the following: Beneficiary I.A., a Medicare and Medicaid beneficiary; Beneficiary M.E., a Medicaid beneficiary; Beneficiary M.F., a Medicaid beneficiary; Beneficiary A.R., a Wellcare Medicaid beneficiary; Beneficiary E.S., a Medicaid beneficiary; and Beneficiary P.W., a Medicare and TRICARE beneficiary.

149. Upon information and belief, at no point in time did anyone inform these patients that these injections were not brand-name Botox.

150. Since between 1995 and November 2010, BEC never purchased legitimate, authorized Botox from Allergan, each and every claim submitted to GHPs for reimbursement under J-code J0585 in this period was a false claim.

151.    Since between 1995 and November 2010, BEC never purchased legitimate, authorized Dysport from Medicis, each and every claim submitted to GHPs for reimbursement under J-code J0568 in this period was a false claim.

152.    Since between 1995 and November 2010, BEC never purchased legitimate, authorized Myoblock from US WorldMeds, each and every claim submitted to GHPs for reimbursement under J-code J3490 in this period was a false claim.

*Shredding Documents*

153.    As of June 26, 2006, Medicare has imposed a freeze on the destruction of Medicare records. No paper Medicare records can be destroyed unless they are electronically imaged.

154.    While Relator was employed at BEC, it had not transitioned to electronic medical records ("EMR").

155.    In fact, Defendant Hardey commented to Relator that BEC was going to "take a hit" because it was not going to comply with the requirement to transition to EMR set forth in the American Recovery and Reinvestment Act of 2009.

156.    Nevertheless, BEC destroys patient records in violation of Medicare regulations.

157.    On January 4, 2012, Relator observed approximately 300 to 400 patient charts in the process of being disposed of by BEC staff, including Beth Schindler, Diane Gerow, and Cathi Principi. There were numerous stacks of charts, two shredding disposals completely full, and three industrial sized garbage bins overflowing with charts at BEC's Suntree location.

158.    Schindler informed Relator that Defendant Hardey had instructed the staff to shred the charts because they were over a year old.

159.    Many of the charts were less than three years old.

160.     Relator advised her staff to stop shredding the documents because BEC was required to retain them much longer than one year.

161.     Relator was unable to take further action because her employment was terminated that day.

162.     Upon information and belief, Defendants continued to submit claims for payment by GHPs for beneficiaries whose records were destroyed in violation of GHP regulations.

163.     Upon information and belief, Defendants have not repaid the GHPs for any of the claims for which they no longer possess the necessary documentation supporting those claims, as required by GHP regulations.

164.     After her termination, Relator was contacted by a former patient, Beneficiary V.A., who had undergone cataract treatment at BEC and the Surgery Center and was experiencing complications from the surgery.

165.     While he was a patient at BEC, Beneficiary V.A., who is a medical doctor, requested his records to review. BEC refused to provide Beneficiary V.A. his records. After much persistence on his part, BEC lied to the patient that it "lost" his records.

### COUNT I
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
### (Against All Defendants)

166.     Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

167.     Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false or fraudulent claims for payment or approval.

168.    The United States was unaware of the falsity of Defendants' claims for payment or approval.

169.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

170.    Relator has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relator demands judgment against Defendants for:

(a)    Actual damages;

(b)    Treble damages;

(c)    Civil penalties of $11,000.00 per false claim that Defendants presented, or caused to be presented, to the federal Government;

(d)    Pre- and post-judgment interest;

(e)    Attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pursuing this case;

(f)    Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)    That Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act; and

(h)    Any other such relief as this Court deems just and proper.

## COUNT II
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)
## (Against All Defendants)

171.    Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

172.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment submitted to the United States.

173.    The United States was unaware of the falsity of Defendants' records and statements and, in reliance on the accuracy thereof, paid Defendants.

174.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

175.    Relator has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relator demands judgment against Defendants for:

(a)    Actual damages;

(b)    Treble damages;

(c)    Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(d)    Pre- and post-judgment interest;

(e)    Attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pursuing this case;

(f)    Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)    That Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act; and

(h)    Any other such relief as this Court deems just and proper.

## COUNT III
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)
## (Against All Defendants)

176.    Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

177.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, concealed and improperly avoided an obligation to pay or transmit money to the United States.

178.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

179.    Relator has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relator demands judgment against Defendants for:

(a)    Actual damages;

(b)    Treble damages;

(c)    Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(d)    Pre- and post-judgment interest;

(e)    Attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pursuing this case;

(f)    Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)    That Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act; and

(h)    Any other such relief as this Court deems just and proper.

## COUNT IV
## VIOLATION OF Fla. Stat. § 68.082(2)(a)
## (Against All Defendants)

180.   Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

181.   Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false claims for payment or approval.

182.   As a result of Defendants' fraudulent actions, the State of Florida has suffered damages.

183.   Relator has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relator demands judgment against Defendants for:

(a)   Actual damages;

(b)   Treble damages;

(c)   Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(d)   Pre- and post-judgment interest;

(e)   Attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pursuing this case;

(f)   Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)   That Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act; and

(h)   Any other such relief as this Court deems just and proper.

## COUNT V
## VIOLATION OF Fla. Stat. § 68.082(2)(b)
## (Against All Defendants)

184.   Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

185.   Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false claims for payment or approval.

186.   As a result of Defendants' fraudulent actions, the State of Florida has suffered damages.

187.   Relator has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(a)   Actual damages;

(b)   Treble damages;

(c)   Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(e)   Pre- and post-judgment interest;

(f)   Attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pursuing this case;

(g)   Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(h)   That Relator be awarded the maximum amount allowed to her pursuant to the Florida FCA; and

(i)   Any other such relief as this Court deems just and proper.

## COUNT VI
## VIOLATION OF Fla. Stat. § 68.082(2)(g)
## (Against All Defendants)

188.   Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

189.   Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, concealed and improperly avoided an obligation to pay or transmit money to the State of Florida.

190.   As a result of Defendants' fraudulent actions, the State of Florida has suffered damages.

191.   Relator has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relator demands judgment against Defendants for:

(a)   Actual damages;

(b)   Treble damages;

(c)   Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(d)   Pre- and post-judgment interest;

(e)   Attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pursuing this case;

(f)   Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)   That Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act; and

(h)   Any other such relief as this Court deems just and proper.

## COUNT VII
## VIOLATION OF 31 U.S.C. § 3730(h)
## (Against BEC)

192.    Relator hereby incorporates the allegations set forth in paragraphs 1 through 165 by reference.

193.    While at BEC, Relator was a highly productive employee. Defendant Hardey stated on several occasions that Relator was going "above and beyond" expectations in terms of reaching out to the community and to other physicians in order to build and expand the practice.

194.    Defendant Hardey also noted that Relator was helping "carry" the business financially.

195.    Relator was so successful at BEC that, in October 2011, she was offered the opportunity to become a twenty-five percent partner in BEC. Relator declined, in part, because of the ongoing fraudulent practices at BEC.

196.    Specifically, in declining partnership, Relator mentioned the ongoing and pervasive problem of optometrists illegally practicing medicine and charging for those procedures.

197.    Shortly thereafter, on November 3, 2011, Defendant Hardey informed Relator that she had not earned her bonus for the year.

198.    Relator questioned Defendant Hardey's calculations, in light of the fact that she was told in May 2011 that she had already earned the bonus, and BEC began paying her monthly installments at that time.

199.    In November 2011, Defendant Hardey admitted that he was not charging the patients for facility fees or anesthesia fees associated with cosmetic procedures. Instead, he was

paying the Surgery Center's facility fees with Relator's surgery fees, and charging the patient's insurance, including GHPs, for the anesthesia fees.

200. Relator objected to this fraudulent misappropriation of funds.

201. Immediately thereafter, Relator was subjected to acts of retaliation.

202. Initially, this retaliation took the form of verbal abuse and physical intimidation. For example, on November 23, 2011, in an in-person meeting to discuss some of the ongoing problems at BEC, Defendant Hardey began yelling at Relator, using profanity, and threatening to physically strike her and raising his hand as though to do so. Defendant Hardey also used other intimidation techniques, including making numerous, harassing phone calls to Relator, and excessively monitoring her computer and her whereabouts.

203. On December 1, 2011, in retaliation for her objections to the fraud committed by Defendants, Relator was placed on "probation" for ten days.

204. The written notice of probation not only failed to identify conduct that would constitute a breach of Relator's contract, it also did not provide any means of curing any purported breach as required by the contract.

205. On January 4, 2012, BEC summarily terminated Relator's employment in retaliation for her objections to and efforts to stop Defendants' fraudulent actions.

## DEMAND FOR RELIEF

WHEREFORE, Relator demands judgment against Defendants for:

(a)     Two times her back pay;

(b)     Compensatory damages;

(c)     Pre- and Post-judgment interest;

(d)     Reinstatement in her previous position at BEC;

(e)     Attorneys' fees and costs of this action; and

(f)     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable of right

before a jury.


Dated: September 5, 2014

                                    Respectfully submitted,


                                    _Jill S. Schwartz_
                                    Jill S. Schwartz, Attorney at Law
                                    Florida Bar No. 523021
                                    David H. Spalter, Esquire
                                    Florida Bar No. 966347
                                    655 W. Morse Boulevard, Suite 212
                                    Winter Park, Florida 32789-3745
                                    Telephone: (407) 647-8911
                                    Facsimile: (407) 628-4994
                                    jschwartz@schwartzlawfirm.net
                                    dspalter@schwartzlawfirm.net

                                    Julie Bracker
                                    Georgia Bar No. 073803
                                    Jason Marcus
                                    Georgia Bar No. 949698
                                    Bothwell Bracker, P.C.
                                    304 Macy Drive
                                    Roswell, Georgia 30076
                                    Telephone: (770) 643-1606
                                    Facsimile: (770) 643-1442
                                    Julie@whistleblowerlaw.com
                                    Jason@whistleblowerlaw.com

                                    Attorneys for Relator, Carrie L. Morris, M.D.